Good morning ladies and gentlemen. Our first case for argument this morning is Neita against Chicago. Mr. Cossaglad. Thank you, Your Honors. May it please the court, counsel. My name is Jared Cossaglad and I represent Vaughn Neita, who is asking this court to overturn the district court's decision to extend qualified immunity to officers Bertorno and Enriquez, as well as reinstate the plaintiff's federal malicious prosecution claim. There were additional errors related to mandatory sanctions and application of the rules regarding judicial actions. To begin, I'd like to discuss the qualified immunity and the probable cause issue related to the arrest of Mr. Neita, and specifically to begin with the clearly established law problem of that issue. The Illinois appellate courts have held that under the animal cruelty statute, law enforcement officers are not free to rely on their own private conceptions of how animals should be treated, and has repeatedly found that the law provides definitive standards for officers to that they are instructed to do that is that conduct is only unlawful when it clearly falls within the realm of the prohibited and prescribed conduct under the statute. Otherwise, it is not unlawful because officers cannot decide on their own when it is too cold outside to have a dog, how much food dogs should receive. They must apply the specific and strict requirements that are fall within the statute. In this case, the defendants have argued in an effort to make the statute as vague as possible, and in doing so have argued for an unconstitutional interpretation of it, which is at odds with the Illinois appellate court's instructions to them to only deal with conduct that falls clearly within it. Mr. Klassiglaed, you aren't disputing that officer Rotorno received complaints from Officer Morgan before going over to the location, are you? To some extent. We're not disputing that she received an email from Animal Care and Control advising that there had been a complaint about inhumane conditions. There is a dispute in the record created by the officer herself through the submission of an affidavit at summary judgment about whether she had additional facts in her possession, but aside from that, no. She did receive a complaint to go investigate at that location about the dog in question. So it isn't just their own observations that they're relying on here. When they arrived at the scene, they already had complaints, which is why they went there in the first place. Would you agree with that? They had a complaint for inhumane conditions that they went to investigate from an anonymous person, and so I would agree that they weren't merely relying on their own observations when they went there and deciding on how to handle these things. However, in deciding whether there was probable cause to believe that there was unlawful conduct, they did apply their own private conceptions about how cold it was outside, and as Officer Rotorno repeatedly testified, that's why she arrested the plaintiff, because she just deemed that it was too cold outside for a dog. The district court found there was a dispute of fact over whether or not the doghouse that Mr. Nieta had built for Macy was habitable, and that really resolves the vast majority of the defendant's claims about probable cause, because that dispute cannot be resolved at summary judgment, and the district court erred by saying that because plaintiff had left Macy in the cold, probable cause existed. Those two things are not reconcilable, where there's a dispute on the one hand of whether the heat in the doghouse was adequate, and on the other, the officer claiming that there was very little heat coming out of the heater that he had wired into the doghouse for Macy to use. So it raises questions, because of course if officers can simply decide how cold it is outside, or it's too cold for animals to be outside, then a citizen who takes a dog for a walk for 30 minutes can be subjected to arrest because an officer has decided when it is too cold. But there's no limitation on that. For example, they can simply decide that a doghouse has to be two inches off the ground like they did in this case, even though there is no such legal requirement that doghouses be two inches off the ground. So citizens have to know when they're violating the law and when they aren't, and that is why the Illinois Appellate Court made the decisions that they did about how officers are supposed to apply this law. Are you disputing that Macy had a choke collar on? Yes, Your Honor. Both officers testified that no chains were used in connection with Macy. But that's separate than a choke collar, and we have photographs of the collar. There are photographs. The photographs that were attached to Ms. Fraternal's affidavit in connection at summary judgment were not the same photographs that were produced in discovery. The photographs in the affidavit are not eight-stamped, and there's a problem with the photographs that we honestly cannot figure out because of the way that they were dealt with. The photographs were produced in a form, but not in that form. And so while they have produced clear photos at summary judgment of what appears to be a collar around the dog's neck, there's no way to determine from those photos whether or not it is a choke-type collar on its own, where both officers testified that there By not disclosing that defense at any point in time during discovery... I thought the testimony was about the tethering, not about the collar itself. That they weren't disputing the tethering and where Macy was tethered, not that she wasn't wearing a choke collar. There's testimony that there's no chains used from both officers. But as far as whether or not there is a choke-type collar being used in this investigation, to investigate or ask questions of any further nature beyond what already went on with the deposition. In fact, during Uriquez's deposition, please correct me if I'm wrong, he is talking about, he is complaining about the way Macy is leashed or attached to the truck, not the nature of her collar. Right. Do we have any of the officers at the time of the arrest raising an issue about the type of Macy's collar? Zero. There's no evidence or testimony or inferences to be drawn from anything in the record related to the collar. And I know that Ms. Rotorno testifies on page 280 of her deposition about it and says there's no chains used. No one ever says anything about the collar whatsoever. And in fact, the defense, the police in this case, on page 4 and 16 of their briefs attempt to quote Officer Rotorno's testimony about the collar. But Your Honors, I would submit they took a creative license that's impermissible advocacy in doing so because Officer Enriquez is not testifying about chains being on Macy as they seem to make it appear. He's actually answering a hypothetical question about whether officers can arrest anyone who leaves their dog outside alone with a leash because what he said was he had a problem with was that the dog was left alone. And that was the nature of the testimony in the case. So in any event, you have the officers creating their own disputes. They want to argue a defense, but they've testified otherwise. And while there's been some claims that their memory failed during their depositions, which they tried to clear up through their affidavits, it's not clear why that was done some two years later on the eve of summary judgment instead of right away if these were really memory failures that caused these things. And I would submit that based on the district court's finding that Officer Enriquez's inconsistencies in her testimony leaves the court without the ability to believe anything she says. Well, the court only accepted what she said if it was supported in the record. Correct. And so she made the requisite findings about the disputes of fact that should have warranted a denial of summary judgment on its own without more. On the question of clearly established law, what's your strongest analogous case in which probable cause to arrest did not exist? People v. Johnson, which is, as the defense raised, an unpublished Illinois appellate court case, and that is a problem. Clearly established law has to be law established in federal courts. So I repeat Judge St. Eve's question. What is your best authority from a federal court? Federal court of appeals, to be precise. The Supreme Court has doubted that decisions of federal courts of appeals can clearly establish law. So your best case would be from the Supreme Court, but if not, from this court. Well, and as far as I know, there's never been an opinion from this court on the animal cruelty statute, but we do cite the Veal case, which deals with child neglect, and it's different. However, I think that the issue of analogous case law under these circumstances is a red herring because the statute itself and the Illinois appellate instructions about what that statute means directed to law enforcement about how to apply it is enough to clearly establish that the arrest in this case was without probable cause. Well, don't we have an or here anyway that you as the plaintiff or Mr. Nieta has the option of showing a clearly established law or that, you know, no reasonable officer confronted with this circumstance would have judged there to be probable cause here. Yes, and that is exactly the case because even when we get past the clearly established law about whether a reasonable officer would do it, the question is what are the undisputed facts that they're relying on in seeking summary judgment, and there aren't any undisputed facts in this case. That's not true. The undisputed facts that they received a complaint from Officer Morgan that it was sub freezing temperature, that there was no food, that there was no water, either it was frozen over or it was empty. I know there's a dispute about that, but that the dog couldn't get to it, that they arrived there and Macy was tethered in an outside area and nobody was around and it was freezing cold. So none of those are disputed. Excuse me. You're correct. The material facts are disputed, and none of those facts Well, the temperature and the conditions outside, that's very material, and that's not disputed because we know from the record what the temperature was. I would argue that not under the animal cruelty statute, and Section 3.01c directly applies to officers in, excuse me, animals in cold weather, and it directs law enforcement officers that you could only arrest someone for subjecting a pet to cold weather when that animal has been injured or dies as a result or suffers a condition that's been diagnosed by a veterinarian like hypothermia. So there are limits on how and whether you can subject an animal to cold weather, but not making up private conceptions about, well, we just think it's too cold out here. And one of the problems they face is that they obviously took the dog back into the same cold weather that they are claiming was too cold for the dog, which was not known until after they produced the videos in this case. And they took the dog back into the cold weather. They recreated the scene for the body camera videos that they didn't produce until after the plaintiff's deposition. And as Officer Returnal testified, she stopped and paused to take a picture because she thought the dog looked cute. These are not, the inference from what they did here in hiding that evidence and in doing that is that they really didn't think it was too cold outside for the dog and that they arrested him for some other reason. Is it disputed or undisputed that the way the dog was tethered to the truck, he still had access to go inside the doghouse, which had the heater? That is undisputed. The officers testified when they first arrived, they saw Macy exiting the doghouse and took a photo right away, and you do see in the photo, she's halfway in and halfway out of the doghouse. And so this whole idea that the dog was too cold or shivering or lifting its paws off the ground is disputed because it wasn't too cold for the dog inside the doghouse and the plaintiff did care for the dog and did clean up after the dog and did do other things that the officers ought to have become aware of. And that's why all the analogous cases talk about issues that are where there's extreme animal neglect, where there's bathtubs full of feces and smells of urine and dogs with injuries to their faces and front paws and consistent with dog fighting because these are things where officers observed that clearly fall within the ambit of inhumane treatment. Mr. Kosselkrank, can I turn please to the malicious prosecution claim?  What's your best evidence that there's an issue effect on malice? The absence of probable cause and the viewing the facts in the light most favorable to the plaintiff, they never really had any concern about the doghouse up until they got back to the police station and started trying to justify his arrest. How would no concern about the doghouse raise an issue effect on malice? It's part of the absence of probable cause to believe that the doghouse wasn't adequate in the first place. You know, they tried to claim the doghouse had no padding, but Officer Riturno admit she didn't check for padding. Is there any evidence that the officers knew your client before or there's any history there? No. There's not. So no evidence of any kind of personal animosity? There's not. There's not any sort of personal animosity there. There's simply what the district court found was that there was a where he challenged her authority and requested a supervisor. And as Officer Enriquez admits, he suggested that they don't have a supervisor. And then as you can see from the video, as he was being arrested, his phone falls to the ground because he testifies that Officer Riturno is grabbing it because he's on the phone with a Chicago police officer who's telling him to call for a supervisor. And so you have this clear evidence of a retaliatory motive and they didn't really believe that he had violated any of these offenses. They actually charged him with not keeping his doghouse two inches off the ground because they were trying to make up some reason why they'd done this and they had no good ones. So they invented that. And that became clear throughout the course of her testimony. If there are no further questions, I'd like to reserve the remainder of my time for rebuttal. Certainly, counsel. Mr. Murrell. May it please the court. There is just one question that underpins essentially all the claims in this case, which is whether there was probable cause or arguable probable cause for a reasonable officer to believe that Mr. Native violated the animal welfare statute in some way. When in response to an animal cruelty complaint that said a dog was being beaten and starved, officers went to a seemingly abandoned lot full of broken vehicles and graffiti junk and on a freezing, snowy day, found a short-haired dog alone tied to a truck with an apparent chain link choke collar on its neck standing in inches of snow, shivering and cold to the touch with no food or drinkable water present. You say it's, you speak as if it's established that the dog had a choke collar. How was that established? Well, the only- It's certainly denied by the plaintiff. Denied based on no evidence in the record. The only available- Well, the plaintiff is competent to testify about what kind of collar he placed on the dog from personal knowledge. So what makes the choke collar undisputed or undisputable? There is no record in the evidence in his deposition or otherwise where he states that there was no choke collar. He's making that argument in his briefs, but that's not an argument that's actually based on anything in the record.  I do not believe so, Your Honor. The only evidence that's actually in the record as to the choke collar is to the extent the officer's own statements are irrelevant to the analysis, but also the photographs that show, based on the ordinary dictionary definition, that the dog was wearing a collar. At the time of the arrest, do we have any of the officers, according to their testimony, raising the issue of this choke collar? I didn't see that in the record. No. At the time of the arrest, they are not discussing the choke collar. However, as Your Honors are aware, for a Fourth Amendment false arrest claim, what matters is not the officer's own subjective views on why they may have arrested someone in the moment, but whether any reasonable officer could believe, based on the facts available at that time, is there any crime that could justify the underlying arrest. And so here, what the city has put forward, based on the discovery record, is showing that there are at least five different provisions of the Animal Welfare Statute, regardless of what was stated in his arrest report, that the evidence shows that he might have reasonably violated. That's failing to provide sufficient food and water. That's failing to provide adequate protection from the weather. Unlawful tethering using a choke-type collar. Abandoning the animal might suffer injury or exposure. And the quasi-catch-all requirement for owners to provide humane care and treatment. Probable cause for any one of those provisions, or even reasonable yet mistaken belief that there's probable cause for any one of those, defeats Mr. Neda's claims. As the city discusses at length in our briefing, the summary judgment record provides ample basis to justify the prosecution. Rather, it is Neda's who fails to satisfy his burden of showing that his arrest, in these circumstances, was contrary to clearly established law. Mr. Merrill, why doesn't the testimony that Macy appeared healthy and well-nourished create an issue of fact about her condition here? So, according to the Illinois Appellate Court, when you have evidence of, or observations by officers of inhumane treatment of an animal, they said in Peoples v. Zamora, for example, that the absence of evidence showing that dogs appeared overworked or emaciated or dehydrated does not immediately rate other inhumane conditions. So, what the officers are looking for is maybe the dog isn't on... But this is different than the absence of evidence. This is affirmative evidence that she appeared healthy. Well, it would be a dispute whether or not the dog seemed healthy to a reasonable officer at that time. Obviously, there was later veterinary reports that wasn't information known to the officers at the time of their arrest. But what we see here is that the officers were coming to a situation where they thought a dog was in danger. They found a dog alone tied up with what a chain around... Whether you want to call it a toe collar or not, there was certainly a chain collar around the dog's neck in freezing temperatures, standing in snow alone. And at that moment, the officers, especially against the backdrop of the complaint they received, certainly had a reasonable belief that that was sufficient to believe that a violation of the welfare statute. I think you just skipped very quickly over what I consider to be an important detail, standing in the snow alone. I thought... My recollection of the record is it's undisputed that when the officers approached, Macy was inside of the doghouse and emerged and exited the doghouse. In fact, that chain, as we were discussing with Mr. Casoglad, was long enough to permit him to go inside the doghouse and out, in and out. Now, you just said one of the... An undisputed fact was when they arrived, he was standing in the cold snow alone. No, the dog definitely could go in and out of the doghouse. What I'm simply saying was that at this point in time, not only was there freezing weather, but the ground was covered in snow. And as the photos in the record indicate, there was kind of snow and frost creeping into the doghouse anyways, indicating that it was not sufficient to protect the dog from the elements. You know, this was a makeshift plywood structure that had holes in it that wind and the snow could enter it. And you see that in the photographs. So this certainly wasn't a structure that was providing adequate... I'm wondering if we have more disputed facts here, because another thing that we are able to see from the video is that the makeshift doghouse did not have snow covering the top of it, like many of the other structures and vehicles on that lot, which certainly creates a dispute of fact as to whether the owner was caring for the doghouse, taking snow off of it, whether the heat was sufficient enough to melt the snow off the top of the doghouse. Do you view all that as, you know, non-material facts? Well, Your Honor, I believe it's certainly true that there was a small heater in the doghouse. There's a dispute about how effectively it worked. But there's no testimony in the record that, for example, as you were saying, that he was taking snow off of the doghouse. I think these are... The time to raise these types of things in the record was during the time that that was unearthed. But I think what's also important is not only is there the prong, for example, in the qualified immunity analysis of whether there is sufficient evidence based on the totality of the circumstances for a reasonable officer to believe there was a violation, but there's also Mr. Nader's burden of showing clearly established law. He does not cite a single animal welfare arrest case, not one, where probable cause was found lacking. Not a single case in all of his briefings, let alone a case with remotely similar factual situations. As just one example, he identifies no case supporting the proposition that finding a dog tied up alone without food or water is insufficient to establish probable cause. To the contrary, the court in Manson v. City of Chicago explicitly held that when officers find empty food in water bowls and no evidence of food nearby, such facts alone gave the officers probable cause. Nader's reply brief did not even attempt to respond to our arguments about Manson. As another example, for the prohibition on the use of the choke-type collar, you can see in the photos that there was a collar that meets the ordinary dictionary definition of a choke-type collar. It does not cite a single case nor a single statute that clearly establishes what the law might consider a choke-type collar, and if it's somehow different than the ordinary dictionary definition. Without any such law identified, it is impossible that officers could have violated clearly established law in this instance. I'm not sure where you're going. What I take from your argument is that that law is too vague to be enforced. You're saying, nobody knows what this means. Choke-type collar? Nah, nobody knows. It's a pretty basic rule that you can't enforce a law if nobody knows what it means. Well, I would suggest that what the law means is it's the ordinary meaning of these words. We provide multiple dictionary definitions and definitions by the Illinois Humane Society where they describe what a choke-type collar is, and that is what you can see in the photographs. But ultimately, for all five subsections of the Animal Welfare Act, that the officers could have believed that Mr. Native violated, he fails to provide any on-point case showing that the law was clearly established at the time of his arrest. So while the city does believe that the totality of circumstances easily establishes probable cause, Native failed his burden and the officers should be protected by qualified immunity. Can I turn to the malicious prosecution claim against the officers? Have you raised qualified immunity as a defense anywhere to the federal malicious prosecution claim? I would have to refresh my recollection, Your Honor, but I believe so. I believe qualified immunity... I didn't see it. I know you did as to the other ones, and I understand at the time the motion to dismiss was filed, we didn't know that there was a federal Fourth Amendment claim for malicious prosecution, and we since know that given the Supreme Court's ruling. But I didn't see anywhere in the record that you raised qualified immunity defense as to that claim. Okay. I would have to refresh my recollection, Your Honor. I don't specifically remember. My understanding was that it was raised for all the claims because it was raised additionally for the retaliatory arrest claim and the property seizure claim, but I can't be 100%, Your Honor. The only other claim that assuming there was either probable cause or arguable probable cause for the arrest that isn't automatically disposed of by that one finding would be that about the property seizure claim where Native complains that the officers upon finding his dog left alone in the freezing cold and snow should not have temporarily allowed that dog to warm up in their parked vehicle. First of all, a Fourth Amendment property seizure claim is ultimately a question of reasonableness, and it was manifestly reasonable to have a seemingly abandoned dog who was left tied up in the cold to warm up in their car while the officers further assessed the situation, and not only was it objectively reasonable, but the Animal Welfare Statute explicitly permits it. In Section 3.01C10, officers are allowed to take temporary custody of an animal exposed to extreme cold conditions, and in Section 3.04, officers are authorized to take possession of an animal incident to arrest. Either provision justifies the officer's actions here, and again, Native doesn't even attempt to rebut qualified immunity based on either provision because he cites zero cases in support of this claim. Let me ask you about the abandonment issue. So we're going back to probable cause. They certainly, the officers, had a complaint that suggested Macy had been abandoned when they arrived on the scene. Now, when they got there, Mr. Native shows up within 20 to 25 minutes, and we are to judge probable cause and arguable probable cause at the time of arrest. So they obviously arrest him after he shows up. So he shows up and says, I'm the owner. That's my dog. Is it your position that the officers don't need to take into account new facts they learned at the scene before they arrest? No, they do need to take into account the totality of circumstances at the time of the arrest. That said, what was actually said in the complaint that the officer received was that someone who at the time alleged to have multiple animal cruelty complaints, leaving his dog out in the cold 24-7. That's not exactly the same as that he was, that the dog was completely abandoned. I mean, I'm going off of what you just told us. You told the dog, you told us that the officers were confronted with a dog that was seemingly abandoned. Right. They were confronted with a dog that was tied up alone outside with no one on the property on a vacant lot, and at that time they believed that the dog there. Now, when Mr. Neda appeared later and said that, oh, that is my dog, they didn't necessarily need to believe a potential suspect that he was there only recently. Obviously, the officers should have taken his statements into consideration, but that doesn't mean that they need to believe that statement. In fact, later in his deposition he even said that the reason why he returned was because he got a phone call from a friend that said, hey, there's people on your lot, and he was concerned about the vehicles he had left there, not about anything about the dog. Well, I want to ask you about that, too, because the officers, you know, they also got a complaint that it's a vacant lot, and then when they arrive, as we can see from the video, there are a number of structures and vehicles on that lot, most of which are covered with snow, and where the snow has been knocked off of some, they are construction vehicles. There are some nice construction vehicles on this lot. I saw a skid steer and some other things. You can clearly see, so it's impossible to tell whether they're operable or not. More facts. I'm wondering whether your position is the officers still believed it was a vacant, abandoned lot. Right. I mean, by vacant, what I was understanding the record to mean was that, obviously, there was no structure on there. There was no clear evidence that anyone was living on there except for in a potentially squatter situation. It was fenced off, so public was not supposed to go on there, and it was filled with whether or not there were some vehicles that may or may not be operable. There's no way to know that based on the record. There's certainly vehicles on there with windows rolled down and snow flying into the vehicles and other broken down graffitied structures. I think it's reasonable to believe that when an officer stumbles upon such a lot that it's reasonable that no one is living there at that time. And there's a trailer on the lot. Well, once again, there's no one in there at the time the officer is arriving. There's no reason to believe that that trailer, like any other of the vehicles on the lot, was being lived in by someone or even functional. The last issue... What role do you think it plays in assessing qualified immunity that the arresting officer essentially confessed to telling tall tales? The word perjury also comes to mind. Right. So I do not believe it matters in this instance because, for example, if you look at our statement of facts, there is not a single fact that we cite to that is not supported by... There is no fact that we cite to where the officer's deposition is the sole source of information for that fact. In addition, the officer immediately upon saying that after aggressive questioning, if you read the full deposition transcript, said, well, I didn't... That's not what I meant. I didn't mean to. It was not intentional, underpinning that she doesn't really understand what legally perjury means in this instance. But ultimately... She seems to believe that she is justified in telling different stories on different occasions, which does raise the question what facts can reasonably be taken as undisputed. There is a clearly established legal rule against making up evidence to support an arrest or prosecution. Right? You don't have to look hard to find that as a clearly established rule. Correct, Your Honour. I mean, what the city proposes here is that, based on the testimony of the other officer present, based on the photographs, based on the arrest reports, based on the information from the... I don't see how the arrest reports can be believed, given the fact that this officer confessed that they were not necessarily true. When we're assessing probable cause for a Fourth Amendment claim, ultimately what we need to consider is what a reasonable officer in that position, not what the individual officer believed. The question for this court is ultimately whether or not, based on the record that we do have in front of the evidence that is undisputed, then the question is whether that evidence is enough for a reasonable officer, not whether this subjective one officer believed that there was grounds for arrest. For example, the arrest report does talk about the two inches off the ground of the doghouse. Now, that is not necessarily a sufficient basis on its own to support an arrest, but it is evidence that the structure was insufficiently protecting the dog from the elements. Here, it ultimately doesn't matter that they wrote that one factor into the arrest report, because we have all this abundance of other evidence that, when doing it from an objective perspective, what a reasonable officer in that position might know, then we have sufficient evidence here. So, again, I just would reemphasize that what's relevant here is not the officer's subjective views about what or what not justifies an arrest, but based on the record evidence, what is, for an objective prudent officer, might reasonably believe. And then in the qualified immunity context, maybe even mistakenly believe, but reasonable nonetheless, because the law is not clearly established at this time. I think it is extremely probative that the other side has failed to put forward even a single false arrest case under the Animal Welfare Statute where probable cause was found lacking, especially in anything that's even remotely factual with similar situations. Therefore, qualified immunity should govern in this instance. What's your strongest argument that there is an issue of fact, that there is not an issue of fact on the malicious prosecution claim as to whether the officers acted with malice? Well, in this instance, the fact that there is probable cause is not the basis that the city is putting forward. The district court did not make that determination. The court only made an arguable probable cause, which wouldn't be sufficient. Well, the district court on the malicious prosecution claim did not actually reach that at the summary judgment stage. Correct. Yeah. But you're asking us to address it here. Correct. Because all of the evidence, there is no dispute, and certainly Mr. Naden, none of his briefing says there is a dispute, that there is any evidence that he would have put forward that was not discovered during discovery for the question about whether malicious prosecution. Here we have the state malicious prosecution claim, the federal false arrest claim, both of which deal with probable cause analysis. So there was every incentive and every opportunity, and there was, in fact, all that evidence presented to the district court. And so, simply, this is just an alternative ground now that all that evidence was presented. His argument is that the best evidence of malice is that there's no probable cause. Correct. I mean, certainly in this case, there is no, as you were discussing with opposing counsel, there is no evidence that the officers knew them or that knew Mr. Naden. What about the lack of probable cause, being arrested without probable cause? Yeah. But if you're arrested with probable cause, then the malicious prosecution claim obviously fails. Right. But that's.. He's saying there's no probable cause. And I'm asking you because we can't rely on arguable probable cause for the malicious prosecution claim. So how would you respond on the record before us to the malice element of malicious prosecution if we can't determine probable cause? Well, I think the burden here would be for Mr. Naden at some point in discovery to put forward evidence of malice, which he has none. So there's just simply no evidence in the record that the officers had any malice in this instance. That should have been something that he pursued during discovery. Are you saying lack of probable cause isn't sufficient to establish malice? It would probably be sufficient as you're correct, Your Honor, it is sufficient to evidence malice at this stage of the proceedings. If Your Honors have no other questions, for these reasons the judgment of the district court should be affirmed. Thank you, Mr. Morel. Anything further, Mr. Kosselbeck? Your Honor? The district court also made a finding in response to plaintiff summary judgment motion on probable cause that a dispute of fact existed over whether probable cause to institute the charges existed. She dealt with this issue. The city did not appeal that issue and that was a finding made by the district court in the record already. I think I'm lost. Why would the defendants need to appeal anything? Because there's already been a determination based on the evidence. No, look, you need to address a legal point that the people who prevailed in the district court can defend their judgment on any preserved ground without needing to file a cross appeal. That's just a legal rule. Whether or not they appealed. They do not need to appeal. Excuse me. I may have miscommunicated. I'm trying to say that the district court addressed the issue already and made a finding that there was a dispute of fact about probable cause which exists. They do not need to appeal in order to dispute that funding. The city also argued that there's no evidence of malice. I think it would be a good idea for you to address the point, the argument made by your adversary that there is no evidence in the record that this is not, that the dog was not held by a choke collar, right? What Mr. Morell said is that there is a denial in papers but nowhere through evidence. Now, is that true or if it's not true, what evidence do you point to? I would point to the testimony by both officers that there were no chains used during, by Mr. Nieto. And he's not, they're not just talking about the leash. All right. You're not pointing to any evidence from the plaintiff. The plaintiff was not asked about the collar. It's fine. You can file an affidavit whether or not you're asked. But I take it it's now agreed there is no evidence from the plaintiff on this point. Yes. Okay. I would agree that the plaintiff did not testify about the collar. But the question that it raises is why if they were going to raise the collar at summary judgment throughout the course of the case, did the defense not say so in the answer or in the interrogatories where they were directly asked for the factual basis on which they believed they were going to try to claim summary judgment for Mr. Nieto's arrest. And they didn't disclose anything until later on at summary judgment when they filed an affidavit from their own officer trying to change her testimony to expand the record to make it seem like all along she believed that she got a complaint about a beaten, abused, terrified dog, which was just not the case according to her own testimony. And it didn't arise until then. And it raises serious concerns about how it is that this officer's testimony was changed at that time and why it was changed then. If not to just... That affidavit didn't address the collar, though, did it? It just addressed the summary reports. It did. It attached the photographs that were the basis for the argument about the collar, which is one of the problems with what has happened here, is if, you know, there's... So... I would also say that the concern about... Well, I actually don't know what I'm going to say next, so I'm going to stop pretending like I know. If there's no further questions, I would rest on what we've already argued on. Thank you. Thank you very much, Counsel. The case is taken under advisement.